# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ESTHER SINKLER,

        Plaintiff

    v.

CAROLYN W. COLVIN,
Commissioner of Social Security

        Defendant

CIVIL ACTION NO. 3:14-CV-00463

(MEHALCHICK, M.J.)

## MEMORANDUM OPINION

This is an action brought under Section 1631(c)(3) of the Social Security Act, 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. § 405(g) by reference), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 16, Doc. 17).

Among other issues, we are called upon to decide whether the ALJ properly denied Plaintiff's request for IQ testing and discredited Plaintiff's allegations that she suffered from an intellectual disability where three treating psychiatrists, a consultative psychological examiner, and a consultative medical examiner diagnosed Plaintiff with some combination of mild mental retardation, borderline intellectual functioning, or illiteracy. For the reasons expressed herein, it is ordered that the decision of the Commissioner be **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

## I.  BACKGROUND & PROCEDURAL HISTORY

On August 24, 2010, Plaintiff Esther M. Sinkler filed an application for SSI, alleging that she became totally disabled on January 1, 2007, due to attention deficit hyperactivity disorder ("ADHD"); learning disability; major depressive disorder with psychotic features; borderline intellectual functioning; cardiac dysrhythmia; allergies; possible arthritis; asthma; and illiteracy.[1] (Admin Tr. 397; Doc. 8-6 p 53). In a pre-hearing memorandum, Sinkler amended her alleged onset date to August 24, 2010. (Admin Tr. 460; Doc. 8-6 p. 116). Sinkler's claim was initially denied on February 7, 2011. Sinkler requested, and was granted, an opportunity to have her claim re-evaluated during an administrative hearing. The requested hearing took place on May 16, 2012, in Harrisburg, Pennsylvania. Sinkler, assisted by counsel, appeared and testified before ALJ Patrick S. Cutter. Sinkler's case worker, Joanne White, drove her to the hearing and testified on her behalf. Impartial vocational expert ("VE") Brian Bierley also appeared and testified at the hearing.

At her May 2012 hearing, Sinkler, age 38, testified that she lives in an apartment with her boyfriend, daughter, and infant grandchild. Sinkler has five children between the ages of fifteen and twenty-one who were raised by Sinkler's mother, all of which allegedly have some sort of psychiatric problems. (Admin Tr. 50, 55; Doc. 8-2 pp. 51, 56). Sinkler testified that she was unable to raise them herself because it "was too much" and she "didn't have the patience."

---

[1] On the same date, Plaintiff filed an application for child's insurance benefits under Title II of the Social Security Act based on her father's social security record and number alleging disability beginning on January 1, 1998 – when Plaintiff was twenty-four years old. This application was withdrawn by Plaintiff prior to her administrative hearing.

(Admin Tr. 50; Doc. 8-2 p. 51). Sinkler left high school after completing tenth grade because she became pregnant. (Admin Tr. 42; Doc. 8-2 p. 43). She asserts that, while in school, she was in special education classes and that she is functionally illiterate though can read small words and sign her own name. (Admin Tr. 45, 54; Doc. 8-2 pp. 46, 55). Sinkler alleges that her illiteracy has prevented her from getting a driver's license (because she is unable to read the test), and has hindered her past efforts to find employment because she could not read or write well enough to complete job applications. (Admin Tr. 42, 44; Doc. 8-2 pp. 43, 45). She also asserts that she was let go from her most recent employment as a housekeeper in 2007 because of a new policy that required her to greet hotel guests by name – which she allegedly could not do because she was unable to read the name from a list. (Admin Tr. 43; Doc. 8-2 p. 44). Her employment records, however, paint a different picture – that she was let go for absenteeism after she called off work 28 times, was tardy 22 times, and failed to show up at work twice over a period of ten months. (Admin Tr. 325; Doc. 8-5 p. 90). Her previous employer noted that when she was there, Sinkler was one of its best housekeepers. *Id.*

Sinkler reportedly did attempt to complete a literacy course after she left school, but asserted that the people in her group laughed at her so she "quit going." (Admin Tr. 43; Doc. 8-2 p. 44). As far as other social activities, Sinkler "walks a lot," plays Pac-Man video games, watches Lifetime movies and cartoons, and goes to church two times a month. (Admin Tr. 48, 50; Doc. 8-2 pp. 49, 51). Sinkler depends on her daughter and caseworker to take her to medical appointments. (Admin Tr. 52; Doc. 8-2 p. 53). She helps maintain the household by washing dishes "a little," going grocery shopping with her sister and daughter, and cooking microwave meals. In a function report from October 2010, transcribed by a paralegal, Sinkler reported that

3

she fixes a sandwich for herself for lunch each day, her boyfriend reminds her to clean their apartment three times per week. (Admin Tr. 422; Doc. 8-6 p. 78).

Sinkler testified that she is unable to work because she cannot stand too long without experiencing pain in her foot and back; read or write well enough to complete job applications. (Admin Tr. 45; Doc. 8-2 p. 46). She testified that she takes prescription medications for her asthma, high blood pressure, and depression. (Admin Tr. 45; Doc. 8-2 p. 46). She could not recall the names of any of these medications, but insisted that her caseworker knew the names. (Admin Tr. 46-47; Doc. 8-2 pp. 47-48). She also reported that her boyfriend sets out her medications in the correct dosage each day because she cannot read the bottles. (Admin Tr. 422; Doc. 8-6 p. 78).

The ALJ denied Sinkler's application in a written decision dated August 6, 2012. Sinkler sought review of the ALJ's decision denying her application for benefits by the Appeals Council. Sinkler's request for review was denied on January 16, 2014, making the ALJ's written decision dated August 6, 2012, the final decision subject to judicial review by this Court.

Sinkler initiated this action by filing a complaint on March 12, 2014, alleging that the ALJ's decision is not supported by substantial evidence and is based on a flawed application of the relevant legal principles. (Doc. 1). She requests that this Court enter an order awarding benefits, or in the alternative, enter an order vacating the ALJ's decision be vacated and remanding this case for a new administrative hearing. On May 14, 2014, the Commissioner filed an Answer, in which she maintains that Sinkler is not entitled to SSI, and that the ALJ's decision was issued in accordance with the law and is supported by substantial evidence. (Doc. 7). Together with her answer, the Commissioner filed a copy of the administrative record. (Doc.

8). Having been fully briefed by the parties, this matter is now ripe for disposition. (Doc. 9; Doc. 12; Doc. 13).

## II.   STANDARD OF REVIEW

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators – the ALJ and this Court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §416.920(a). Under this framework, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §416.920.

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §416.945(a)(1); SSR 96-8p, 1996 WL 374184. In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating the provisions of 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. §416.912; *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 416.912(f); *Mason*, 994 F.2d at 1064.

Once a final decision is issued by the Commissioner, and that decision is appealed to this Court, our review of the Commissioner's final decision is limited to determining whether the findings of the final decision maker – the ALJ in this case – are supported by substantial evidence in the record, as it was developed before that decision maker. *See* 42 U.S.C. § 405(g)(sentence five)(incorporated by 42 U.S.C. §1383(c)(3)); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason*, 994 F.2d at 1064. But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Sinkler is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

III.    **THE ALJ'S DECISION**

In his decision, the ALJ proceeded through each step of the five step sequential evaluation process. At step one, the ALJ found that Sinkler did not engage in any substantial gainful activity during the relevant period. (Admin Tr. 20; Doc. 8-2 p. 21). At step two, the ALJ found that Sinkler had the medically determinable severe impairments of illiteracy, learning disability, depression, and attention deficit disorder, and had the medically determinable non severe impairments of foot pain and numbness, hives, upper extremity pain and weakness, and lower back pain. *Id.* The ALJ found that Sinkler's alleged impairment due to mental retardation was not medically determinable because there was "no persuasive evidence to document [Plaintiff's] mental retardation before the age of 22 and no persuasive evidence, including clinical findings, laboratory testing, or examinations to document [Plaintiff's] current allegation of mental retardation." (Admin Tr. 22; Doc. 8-2 p. 23). At step three, the ALJ found that Sinkler did not have an impairment, or combination of medically determinable impairments, that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin Tr. 22; Doc. 8-2 p. 23).

Before proceeding to step four, the ALJ evaluated Sinkler's residual functional capacity based upon his review of all the relevant evidence in the record, which included medical source statements and RFC assessments by two consultative examiners and one non-examining medical source. *See* 20 C.F.R. §416.945. The ALJ is required to weigh these medical opinions in accordance with a clearly articulated regulatory framework. 20 C.F.R. §416.927; *see also* SSR 96-6P, 1996 WL 37410.

On December 15, 2010, psychologist Louis Laguna examined Sinkler and completed a narrative report and medical source statement in which he expressed his views about her mental impairments. (Admin Tr. 665-71; Doc. 8-8 pp. 55-61). Dr. Laguna noted that, Sinkler's "mannerisms were noteworthy in that she clearly has limited intellect and poor vocabulary." (Admin Tr. 666; Doc. 8-8 p. 56). On examination, Dr. Laguna found that Sinkler was unable to interpret simple proverbs like "you can't judge a book by its cover" and did not seem to understand his instructions when asked to calculate serial threes. (Admin Tr. 668; Doc. 8-8 p. 58). Dr. Laguna diagnosed Sinkler with depressive disorder, mild mental retardation (by observation), arthritis and asthma (by report), and found that she had a global assessment of functioning ("GAF") score of 45. *Id.* In his accompanying medical source statement, Dr. Laguna opined that, due to her clear intellectual limitations and poor judgment, Sinkler had moderate restriction of her abilities to: understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; and, respond appropriately to changes and work pressures in a usual or routine work setting. (Admin Tr. 670; Doc. 8-8 p. 60).

An administrative development summary worksheet reveals that on December 28, 2010, non-examining psychologist Elizabeth Hoffman, Ph.D., recommended that "[s]ince school records do not include IQ scores, nor are they found elsewhere in the MER, I think we need to have IQ testing since it may be that claimant equals listing." (Admin Tr. 728; Doc. 8-8 p. 118). No IQ testing was ordered for reasons detailed in the same summary. *Id.* Dr. Hoffman then completed a PRT form and mental RFC assessment on January 3, 2011. (Admin Tr. 673-89; Doc. 8-8 p. 63-79). Without examining Sinkler, Dr. Hoffman opined that the medical evidence established the existence of depressive disorder, personality disorder, and polysubstance

dependence (in remission). *Id.* Furthermore, Dr. Hoffman agreed with Dr. Laguna's assessment, except that she found Dr. Laguna *underestimated* Sinkler's impairment in social functioning and found that, in addition to the limitations identified by Dr. Laguna, Sinkler was also moderately limited in her ability to respond appropriately to supervisors and coworkers. (Admin Tr. 675; Doc. 8-8 p. 65).

On January 12, 2011, Dr. Jessica Ward examined Sinkler and completed a narrative report, range of motion chart, and medical source statement concerning Sinkler's physical limitations. (Admin Tr. 693-704; Doc. 8-8 pp. 83-94). Dr. Ward reported that Sinkler was an "extremely poor historian," and had child-like mannerisms and speech patterns. *Id.* Dr. Ward diagnosed Sinkler with depression, illiteracy, chronic back pain, and a history of bilateral carpal tunnel syndrome, and ordered an x-ray of Sinkler's lower back. *Id.* Dr. Ward opined that Sinkler could: frequently lift or carry up to three pounds and occasionally lift or carry twenty pounds; stand and walk up to four hours per day; sit eight hours with a sit/stand option; occasionally bend, kneel, stoop, crouch, balance, and climb. Dr. Ward also noted that Sinkler had limitations in her ability to handle, finger, and feel. *Id.*

Based on the record as a whole, the ALJ found that, during the relevant period, Sinkler had the RFC to perform light work, as defined in 20 C.F.R. §416.967(b), except that:

> The work has to be performed sitting or standing; the claimant should only occasionally climb, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to dust, fumes and gasses. The work should not involve any significant reading (reading GED code of 1 only), or complicated mathematical calculations; and the work should be unskilled, which is defined as work that requires little or no judgment to do simple duties, that can be learned on the job in 30 days or less with little vocational preparation. The work should be low stress, defined as work that involves only occasional decision-making and occasional changes in the work setting. There is a moderate (more than slight limitation, but the function can still be performed on a consistent enough basis to

be satisfactory to employer) restriction in the ability to: make judgments on simple work related decisions; respond appropriately to work pressures; interact appropriately with co-workers and supervisors; maintain concentration for extended periods; and understand, remember, and carry out detailed instructions.

(Admin Tr. 23-24; Doc. 8-2 pp. 24-25).

At step four, the ALJ found that Sinkler had no past relevant work. (Admin Tr. 28; Doc. 8-2 p. 29).

At the hearing, a VE testified that an illiterate individual between the ages of 18 and 49 with no relevant work experience and the above RFC could perform work which exists in the national economy. The VE then identified the following representative occupations that such an individual could perform: conveyor line – bakery worker, (DOT #524.682-022) with 98,000 jobs in the national economy and 260 jobs in the regional economy; final assembler, (DOT # 713.687-018) with 32,000 jobs in the national economy and 114 jobs in the regional economy; and inspector (DOT 669.687-014) with 36,000 jobs in the national economy and 110 jobs in the regional economy. (Admin Tr. 70-72; Doc. 8-2 pp. 71-73). Based on this testimony, the ALJ found that Sinkler could perform other work, and that this work existed in significant numbers in the national economy. (Admin Tr. 28-29; Doc. 8-2 pp. 29-30).

## IV.   ANALYSIS

In her brief, Sinkler asserts that the ALJ should have ordered IQ testing to assess this cognitive impairment under Listing 12.05, which deals with mental retardation and intellectual disability. (Doc. 9 pp. 16-17). This Court agrees.

Though the burden is on a claimant to prove disability at steps one through four, a social security hearing is a non-adversarial proceeding. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). Thus,

the ALJ also bears some responsibility to ensure that an adequate record is developed, even where a claimant is represented by counsel. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000)(*citing Richardson*, 402 U.S. 389, 400-01(1971)); *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005). The Social Security Regulations provide that, if the ALJ cannot get the information necessary to make a determination from a claimant's medical sources, a consultative examination may be purchased by the Administration. 20 C.F.R. §416.919a. A consultative examination may be purchased "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to support a determination or decision on your claim." *Id.*

This obligation is especially acute in cases like this one, where a claimant alleges intellectual disability, because standardized intelligence test results are essential to the adjudication of almost all cases of intellectual disability under the Listing 12.05.[2] 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00(D)(6)(b). In this case, there are no standard intelligence test results in the record. Sinkler requested that an IQ test be performed, but the ALJ denied this request because "there exists no persuasive evidence to document claimant's mental retardation before the age of 22 and no persuasive evidence to document the claimant's current allegation of mental retardation." (Admin

---

[2] Listing 12.05 provides that "[i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.05. The required level of severity for this disorder is met where the claimant meets any one of the following criteria: (A) she is so incapacitated that she depends upon others for personal needs and cannot follow directions, thus is completely unable to take an IQ test; (B) her IQ is 59 or lower; (C) her IQ is between 60 and 70 and she also suffers from another medically determinable severe impairment; or (D) her is between 60 and 70 and she suffers from at least two of the "paragraph B" criteria due to her intellectual disability.

Tr. 19; Doc. 8-2 p. 20). This Court's review of the record reveals that Sinkler's treating psychiatrists, Drs. Garloff, Ikram, Yaroslovsky each diagnosed Sinkler with some form of cognitive deficit (mild mental retardation, borderline intellectual functioning, or illiteracy) in their treatment notes – though some of these diagnoses were "presumed" or "by observation." (Admin Tr. 614-34, 858-76; Doc. 8-8 pp. 4-24; Doc. 8-10 pp. 13-31). It was also noted on multiple occasions in their treatment notes, Sinkler's treating psychologists noted that cognitive evaluation revealed lower than average intelligence, illiteracy, and limited insight and judgment, (Admin Tr. 617- 21, 864; Doc. 8-8 pp. 7-13; Doc. 8-10 p. 19), though such observations are not included in *every* treatment note. Furthermore, both consultative examiners also noted some form of cognitive deficit: Dr. Laguna diagnosed Sinkler with mild mental retardation,[3] and Dr. Ward noted that Sinkler was illiterate. Only one non-examining source, Dr. Hoffman – who *recommended* that IQ testing be performed – did not diagnose Sinkler with an intellectual disability. Thus, there is clearly some evidence to support Sinkler's current allegation of intellectual disability. Further, the ALJ failed to indicate whether he considered this evidence in denying Sinkler's request for IQ testing or, if he did consider it, explain why he found it to be unpersuasive.

---

[3] Four degrees of severity can be specified to reflect the level of an individual's intellectual impairment: mild; moderate; severe; and profound. *American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders*, 42 (4th Ed. Rev. 2000). By definition mental retardation is "mild" where an individual has an IQ from "50-55 to approximately 70." *Id.* An IQ in this range corresponds to Paragraphs B and C of Listing 12.05. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.05.

While nothing in this opinion is meant to suggest that Plaintiff's actual IQ would fall into this range, the Court finds that it is significant that multiple sources found that Plaintiff functioned at a level consistent with an IQ score in that range by observation.

Given the evidence in the record, the Court cannot conclude that substantial evidence supports the ALJ's decision that Sinkler's alleged intellectual disability is not medically determinable and that no IQ tests were necessary. While "the mere presence of a mental disturbance does not automatically indicate a severe disability," *Plummer*, 186 f.3d at 434, in the rare instance where medical evidence corroborates the existence of such an impairment, and the nature of the impairment itself makes it impossible to resolve an existing ambiguity in the record without diagnostic testing, it cannot be ignored. Though the Administration did attempt to develop this issue at the initial level by ordering a psychiatric examination *without* IQ testing, the CE's diagnosis of mental retardation, taken in the context of the record as a whole, was sufficient to obligate the ALJ to order IQ testing.

The Court also finds that if Sinkler receives a qualifying IQ score, there is sufficient evidence to infer the onset of disability prior to age 22. Sinkler testified that she was in special education classes until she left school – which cannot be confirmed or refuted because her school records were destroyed in a flood – and that she unsuccessfully attempted to learn to read after she left school. Further, there is no evidence of any traumatic event that might have induced an intellectual disability at a later stage of life. The Third Circuit has found that such evidence, in combination with a qualifying IQ score, is sufficient to satisfy a claimant's burden to show onset prior to age 22. *See e.g. Markel v. Barnhart*, 324 F.3d 182, 188-89 (3d Cir. 2003)(finding that a claimant's placement in special education classes, dropping out of school, history of unskilled work, and the absence of a traumatic event that might have induced mental retardation at a later stage of life, when coupled with a qualifying IQ score is sufficient to infer early onset); *Cortes v. Comm'r.of Soc. Sec.*, 255 Fed. Appx. 646, 653 (3d Cir. 2007)(finding that evidence showing that claimant could not learn how to

14

read or write and had no recent work experience when coupled with an IQ score of 58 from a test administered when the claimant was 45 years old is a sufficient basis from which early onset can be inferred).

Because the Court finds that remand is necessary for further development of the evidentiary record in this case, it need not address Sinkler's remaining arguments that the ALJ erred in assessing the severity of her physical impairments, erred in his conclusion that Sinkler did not meet the paragraph B criteria of Listing 12.04, improperly weighed the medical evidence of record, failed to call a medical expert to testify at the hearing, and improperly discounted Sinkler's testimony.

## V.    CONCLUSION

Based on the foregoing, the Court finds that the record is not sufficiently developed such that it could provide a substantial basis for the ALJ to conclude that Sinkler was not disabled, thus the ALJ's decision is not supported by substantial evidence. Therefore, the Court will vacate the decision of the Commissioner and remand the case for further proceedings.

An appropriate Order shall issue.

Dated: February 6, 2015                               *s/ Karoline Mehalchick*
                                                       **KAROLINE MEHALCHICK**
                                                       **United States Magistrate Judge**

15